## Thomas E. Wibel, Appellee, v. Illinois Central Railroad Company, Appellant.

1. NEGLIGENCE—*how question determined.* If there is evidence tending to support a charge of negligence the question of whether there was negligence in fact is one to be determined by the jury.

2. NEGLIGENCE—*when railroad company guilty of, in connection with construction and maintenance of street crossing.* *Held,* under the evidence, that a brakeman of the defendant company was entitled to recover because of the negligence of such company with respect

350     APPELLATE COURTS OF ILLINOIS.

Wibel v. Illinois Cent. R. Co., 155 Ill. App. 349.

to the construction and maintenance of a crossing by reason of which such brakeman while performing his duties caught his foot between a plank and a rail and was thrown across such rail and injured by being run over.

3. RAILROADS—*status of crossing plank.* *Held,* that the crossing plank in question in this case was a part of the public road.

4. RAILROADS—*duty to employes with respect to tracks.* "The law requires a railroad company to exercise reasonable and ordinary care and diligence in furnishing safe tracks for its employes. If it is necessary for the safety of its employes in the larger towns and terminals, it is equally necessary in the smaller places where switching is necessary to be done." "Railroad tracks within switch limits must be ballasted so as to render them reasonably safe for the use of employes in the performance of their duties, and an employer might be held liable for a failure to use such reasonable care."

5. RAILROADS—*what does not excuse failure to ballast tracks.* The fact that a railroad company was not accustomed to ballast its tracks at places similar to the one in question, does not excuse it from ballasting if it was required so to do in order to make a reasonably safe track for the use of its employes.

6. ORDINARY CARE—*what competent upon question of.* "Where an injury complained of was caused by an instrumentality or method which, at the time of the accident, was in its normal condition, evidence going to show that such an instrumentality was or was not commonly used under similar circumstances by persons in the same line of business as the defendant is always competent for the purpose of proving that he was or was not in the exercise of due care in adopting or retaining that instrumentality as a part of his plant."

7. EVIDENCE—*when proof of custom competent.* Proof of a custom and usage is sometimes competent upon the question of notice.

8. PRACTICE—*when special interrogatories properly refused.* It is not error for the court to refuse to have the jury say upon which count or counts they found for the plaintiff, if any.

Action in case for personal injuries. Appeal from the City Court of East St. Louis; the Hon. W. J. N. MOYERS, Judge, presiding. Heard in this court at the October term, 1909. Affirmed. Opinion filed April 9, 1910.

KRAMER, KRAMER & CAMPBELL, for appellant; JOHN G. DRENNAN, of counsel.

WEBB & WEBB, for appellee.

MR. JUSTICE DUNCAN delivered the opinion of the court.

Illinois Central Railroad Company appeals from a judgment recovered by Thomas E. Wibel in the City

Court of East St. Louis, in the sum of $10,000, for personal injuries received while employed by appellant as a brakeman on one of its freight trains. The court denied appellant's motion for peremptory instructions and overruled appellant's motion for a new trial, upon which rulings a number of errors are assigned here.

This is the second appeal in this cause, a judgment for $10,000 herein being reversed and the cause remanded for further trial by this court at its August term A. D. 1908, for errors in instructions. 147 Ill. App. 187. The cause has been again tried upon the second, third, fifth and sixth counts of the second amended declaration filed May 18, 1909, the first and fourth counts thereof being withdrawn from the jury. The substance of the charge in the last declaration is that appellant negligently suffered a certain public road crossing and its track at Reynoldsville, Illinois, to be and remain in an unsafe condition, to wit: that a plank west of the east rail in said crossing was too far from said rail, and that the ties north and adjoining said plank and crossing were uncovered and projected above the surface of the ground, and that the spaces between the ties at said crossing were unfilled; whereby appellee without knowledge thereof and while discharging his duty as brakeman in disconnecting the air hose at the ends of two moving cars, with all due care and caution, had his foot caught between said plank and rail, was thrown forward and thereby caused to step into one of said open spaces and fall across the rail; whereby the cars ran over and crushed his left leg and caused him to lose the same.

The fifth count contains the further allegations that it was the custom and usage of the defendant to ballast its said main line, and side tracks within switching limits, on its road at switching yards, up to and level with the surface of its ties, so as to enable its servants to do their switching without injury, and that at said time and place where there were switching tracks and yards, he was without notice of said hole and said un-

covered ties, and was relying on a compliance there with said custom and usage.

Appellant's first contention is that appellant was not guilty of any negligence in the construction and maintenance of the crossing. Counsel say: "The construction of the crossing in question was an engineering problem. The presumption is that the structural program adopted and used in its construction was in accordance with the practical necessities of the case, and, in fact, the undisputed evidence shows this to be true, regardless of that presumption." We must, and do, recognize the doctrine that it is against public policy for courts to lay down rules as to the manner of the construction of railroads or to submit to a jury for decision purely engineering questions of railroad construction. The crossing plank in question is no part of the railroad construction in the sense spoken of by counsel, and is not placed there as any essential part of the railroad as such, but as a part of the public road. The railroad so far as its use and operation is concerned could better do without the plank than with it. It is not even a convenience for any employe of the road while operating or assisting in its operation. The plank is entirely for the convenience of the public in traveling the public road; and, but for the fact that the public road is at that point, the plank would not be there at all no matter how extensive might be the switch yards. While this is true it must necessarily be left to the railroad world to say how near the plank may approach the rail, and the honest decision of the competent engineers must and does settle this question, and hence it is probably in every case necessarily left to the railroad companies to place these crossing planks. When they do this they are adding to their construction that which is a convenience and a necessity to the public in the use of the public road simply; and at the same time it is probably true that they are adding a new danger to the foot traveler as well as to the employes of the company. The space must not be

too small because that would endanger more people by derailment of trains than if too wide for public travel. If there is any well-known distance or distances that will minimize or remove all danger, it seems reasonable that these should be adopted.   We think it is a proper question for a jury to pass on after hearing all competent evidence thereon, as to whether or not a railroad company has been guilty of negligence in placing one of these crossing planks; and, of course, a question finally for the court as to whether or not the jury have settled it against the manifest weight of the evidence. All the witnesses testifying for appellee give the width of the north two feet of this opening (where appellee got his foot caught) at two and one-half inches or more.   Of these witnesses Charles Griffith said he measured it and that it was two and one-half inches and had been that way since the crossing was placed there.   The witnesses for appellant testified that it was one and seven-eighth inches wide at south end and gradually got wider to north end where it was two and one-eighth inches wide.   McRoberts and Vaughn so testified and they measured it, while another witness, Roe, supervisor of appellant, testified that it varied from one and seven-eighth inches wide at north end to two and one-eighth inches wide at south end, reversing the measurements of McRoberts and Vaughn. Vaughn, the section foreman, who placed the plank in the crossing testified that he intended to get it just two inches from the rail all the way.   He says it is a cypress plank about fourteen feet long, ten inches wide and three inches thick.   The other evidence shows that it is about three and one-half inches thick and about one and one-fourth inches lower than the ball of the rail, and that the spaces there between the ties are not filled with ballast, leaving the hole five or six inches deep.

F. J. Parrish, an expert civil engineer and witness for appellant, states that the flange of the wheels should have a certain amount of space for play, usually from one and three-quarter inches to two inches; and

again says from two and one-fourth to two and one-half inches, and that the space should not be filled beyond the level of the ties, about four and one-half inches. The evidence further shows the tread of the flange to be about three-fourths of an inch, that is, that it extended that far below the ball of the rail. Under this evidence we think the settling of the question of negligence in regard to the width and depth of this hole, particularly in view of the fact Vaughn admits it was not put down by him as instructed, or as he intended, was properly left to the jury. It has been so held in the following cases which are directly in point: E. J. & E. Ry. Co. v. Raymond, 148 Ill. 242, and 47 Ill. App. 242; B. & O. S. W. Ry. Co. v. Keck, 89 Ill App. 72.

The evidence clearly shows that appellee was injured on the public road crossing and on the main line of appellant's road and within the switching limits of the road at said town of Reynoldsville. There are three switches at this point known as the passing track, the house track and a spur track. The passing track and the house track lie just east of the main track at the place of the accident and the switch-stands are north and south of this point. It is proved without contradiction that there is considerable switching done at this point particularly in the day time, and some at night by the through trains. It is also clearly proved that the main track just north of and adjoining this road crossing was not ballasted, or surfaced up level with the surface of the ties, and that there was a hole or an unfilled space at the very point where appellee was injured. A number of witnesses testified that this space or hole was from four to six inches lower than the bottom of the crossing plank or surface of the ties there. The photograph of this crossing introduced in evidence and relied on by both parties to corroborate their respective claims also clearly shows that the ballast between the crossing plank and the first tie north of it does not come higher up on the tie than about its middle and that almost the full thickness of the next tie

north shows above the ballast. It is said by appellant's counsel that it was not required to ballast its track between the rails at any place for the protection of switchmen. One reason assigned is that by reason of the "safety appliance acts" of the United States and of this state, automatic couplers, air-brakes, grab-irons, and draw-bars of uniform height, and other safety appliances, are required to be used on cars and engines, so that brakemen can do their work without going between the cars to couple and uncouple them, etc.; and that the law of this state requiring switching yards to be ballasted and surfaced when dangerous to switchmen in performing their work is no longer applicable.

In the statement of appellant's counsel we find this description of the air line and hose: "At the point where the air-hose connects with the air line on each car is what is known as an angle cock. This angle cock consists of a lever of six or seven inches long attached to the air hose. This lever is practically over the rail on either side of the car. By means of turning the angle cock a valve on the inside of the hose stops the air at that point from going further to the rear of the train. One of these angle cocks is on each air hose, so that there will be two of them in the connection between the two cars. The angle cocks are between the drawbars and the side of the car. At the time in question the angle cock on the rear car of the two cars in question was on the east side of the car coupling apparatus on the rear car, and between the draw bars and the rail, being nearly over the east rail as is indicated by the testimony of the appellee as hereinafter set forth as to what he was doing just before he was injured while the angle cock on the front car of the two cars was on the west side of the coupler. * * * The hose from the rear car of the two cars in question then crossed over the space intervening between the two cars and under the drawbars and the two were joined together by means of a catch or lock immediately under

the drawbar, and about eighteen inches from the ground."

Now, appellee went between these two cars for the purpose of cutting the air line, and how these hose can be coupled or uncoupled without going between the cars and over the rail is not explained. If there is any evidence in this record showing that there is no necessity for going between the rails we have failed to find it. Besides our Supreme Court has announced it as a duty of railroads to ballast their switching yards when dangerous to switchmen long before and long since these safety appliance acts were passed. Appellee testified that cutting the air hose was a part of his duty as brakeman and it is undisputed; and Conductor Nelson of that train crew testifies for appellant that he told appellee at the time in question to do this work, telling him where to cut the train, etc. In I. C. R. R. Co. v. Cozby, 174 Ill. p. 116, our Supreme Court said: "The theory of plaintiff on the trial was that the spaces between the ties for eight or ten feet north of the 'heels' of the 'switch points,' where there were 'no bridles' and when there was no excuse for leaving them open, were negligently left unfilled; that deceased, while in the discharge of his duty in attempting to uncouple the train, came to his death by stepping into one of these unfilled spaces. * * * If this theory was the correct one (and there is evidence to support it), then the negligence of the railroad company was established."

In I. C. R. R. Co. v. Sanders, 166 Ill. p. 278, it is said: "The evidence seems to show that, as a general rule, railroad companies at stations within switching limits, have their tracks filled up to the level of the ties, so that brakemen may walk over the ties in coupling cars without stumbling or falling. If this precaution had been observed it is apparent appellee's foot, in attempting to couple the cars in question, would not have been caught under the ties, and he would not have stepped into the cattle-guard and received the injury."

In L. E. & W. R. R. Co. v. Morrissey, 177 Ill. p. 382, after quoting from the Sanders case, the court says: "'What was said in the Sanders case is applicable here. The evidence in this case shows that many of the railroads—the Chicago and Alton, the Chicago and Northwestern, the Chicago, Burlington and Quincy, and several other roads—on the main track, in the switch yards and at terminals, grade up their tracks even with the top of the ties to make them safe for brakemen coupling and uncoupling cars. The law requires a railroad company to exercise reasonable and ordinary care and diligence in furnishing safe tracks for its employees. If it is necessary for the safety of its employees in the larger towns and terminals, it is equally necessary in the smaller places where switching is necessary to be done.''

It is said again by said court in I. C. R. R. Co. v. Eicher, 202 Ill. p. 562: "The place was used by employees of the defendant and was within its switch yards. It was its duty to use reasonable care to provide a safe and suitable place for its employees to work. Railroad tracks within switch limits must be ballasted so as to render them reasonably safe for the use of employees in the performance of their duties, and an employer might be held liable for a failure to use such reasonable care.'' The same doctrine is also recognized in L. E. & W. R. R. Co. v. Wilson, 189 Ill. 89.

The foregoing citations answer about all the questions raised by appellant, challenging the statement that there was any duty on the part of appellant to ballast its track at the place in question. The size of the town, the amount of the business done, the amount the railroad company realizes on the business done, or the fact that it has no switch engine and crew stationed there can have nothing to do with eliminating such a duty if it be shown necessary to make the switch yards reasonably safe, as was done in this case.

The safety appliance acts were not intended as steps backward in making safe switch yards, but as an addi-

tional step forward to minimize the great number of employes that were being killed or crippled in switching, the most dangerous occupation in railroad service. There are many more reasons why there should be no limitation of this salutary rule, than that said employes may be more safe while coupling and uncoupling cars. They must necessarily cross back and forth over the track, and otherwise on the track, in front of cars and engines and behind them in the performance of their various duties as brakemen, when not in the act of coupling or uncoupling cars and when a fall or a momentary stumble may be fatal.

We recognize that it is necessary for every railroad company to have proper drainage to get the most good out of ballast, as claimed by appellant. This would be a valid excuse for not ballasting the road, if it was proved that it could not be both drained and ballasted at the place in question. We are unable to conceive of any place in a right of way, or in the one in question, that cannot be thoroughly and completely drained by covered drains and the surface still be maintained in reasonably safe condition for brakemen; and we find nothing in the evidence in this case that will excuse the defendant from ballasting on the theory or claim that it cannot be both drained and ballasted. The fact that the company was not accustomed to ballast its tracks at places similar to the one in question, if it was a fact, would not excuse it from ballasting if it was required in order to make a reasonably safe track. This point however was strongly controverted by appellee, and the jury would be warranted in their finding against the defendant that such a custom prevailed. If it did prevail then it would only be available as proof tending to show notice to appellee of the conditions there.

We have considered thoroughly what the appellant has to say on the question of contributory negligence, assumed risk, proximate cause and the weight of the evidence. We think that under the evidence these are

all questions for final settlement by the jury, and that we would not be warranted in saying that the verdict is manifestly against the weight of the evidence or that it is excessive. Two verdicts have been rendered for the same amount. The appellee's testimony is in substance, that he received his injury on a dark, foggy morning about four o'clock, at the north end of this crossing plank while the conductor was standing on the passing track at the south end of the crossing, which would be about fourteen feet away; that there was a hot box in this train about the sixth car from the engine and they stopped there to cut it out on the side track; that only in cases of such an emergency did they ever stop at Reynoldsville at all and that he never did do any switching there before and was not acquainted with these switch yards and knew nothing of these holes or of the unballasted condition of this switch yard; that when the train stopped it ran too far south for the car to pass back clear of the cut-off, and that both he and the conductor gave a back-up signal; that about that time they discovered that the next car behind the hot box also had a hot box and that it would not be necessary to back up and that they both again signalled to the engineer to stop; that then at the direction of the conductor while they were standing at the south end of the crossing near the passing track, he stepped back between the north car with the hot box and the car north of it while the train was going about two miles an hour; that he was a-straddle of the rail holding the grab-iron of the car in front of and north of him with his right hand and with his left hand on the angle cock; that he stepped then with his left foot, the toe part, between the plank and the rail and that his foot went down three or four inches; that his foot caught a short while and he jerked it while the cars were moving slowly northward; that they bumped him in the back and he started to fall, straightened up pretty quick, jerked his foot out, and stepped with it

360     Appellate Courts of Illinois.

Wibel v. Illinois Cent. R. Co., 155 Ill. App. 349.

off the north end of that crossing plank into a hole, and that that threw him down right inside the rail right north of the crossing, and while trying to get himself and leg over the rail the wheels ran up his left leg and crushed it and caused it to be amputated about five or six inches below the hip; that his foot caught in the plank about eighteen inches south of the north end of the plank; that when he fell his leg was on the west side of the rail and that he had his lantern on his right arm and that then they stopped the train.

The only eye witness, Conductor Nelson, corroborates him in every particular, except that he says appellee never got his foot out from between the plank and rail at all, though he states he fell off the north end of that plank in the hole north of it. Appellee's foot was clear of the hole when the train stopped. Several witnesses for appellant, including the employes on that train, testify to various statements that he made that night and afterwards before he brought this suit, all only tending to contradict him as to his statements that he jerked his foot out before the wheels ran over him. The statements of these various witnesses are as follows, varying with different witnesses: "Wibel told me he got his foot caught between the plank and the rail, had his foot caught in there. As I understood, he said the heel of his shoe." "He told me while he was lying down there before we put him in the caboose, that he got his foot in the crossing plank and could not get it out." "He told me he got his heel 'ketched' between the plank and rail and could not get it out." "He said he got his foot caught and was suffering." "He told me he got it out, and before he could get away it caught him." "He said he got his foot caught, that is all he said." "He said that his foot got caught between the crossing plank and the rail; that he jerked and yanked and got it out; that he yanked it loose, but before he could get it out of the

way, the car caught and knocked him down and ran over his leg."

These statements were all made apparently at different times but shortly after the accident before he saw any attorney. It will be seen that none of them were intended or given as full explanation of what took place. Some of them do not contradict his statement on the trial at all, and those that did, he denied making them in those words. They were evidently given while suffering intensely when talking could not be indulged in to the extent of giving any full or detailed account. Two strong circumstances tend to corroborate him in the statement that he did get his foot out before it was crushed, the fact that it was out and several feet away from where it was caught after the cars stopped, and that he was lying north of the plank in the unballasted part of the road or side of it. His suffering was extreme and long, and he was twenty-eight years old and earning good wages. We do not think the fact that the plaintiff only filed his first count of his declaration when he began suit of any controlling influence in proving that appellee changed the facts and the theory of his case, as the other counts were filed before the first trial.

Appellant contends that it was error to permit witnesses to testify that it was the practice and custom of appellant to ballast its tracks at similar places when switching was required to be done. We have already quoted from our Supreme Court in cases where such evidence as to the custom of other roads was sanctioned by them to prove negligence. 1 Labatt on Master and Servant, sections 53 and 53-d, is authority at least for such evidence being competent to prove the servant's knowledge of the risk. The same doctrine is held in Penn. Co. v. Hankey, 93 Ill. 584. The court in this last case also says on page 584: "Again he had surely no reason to assume or suppose this side track was ballasted, unless by the custom of railroad com-

panies such tracks were very generally, if not universally, ballasted.'' If such evidence is admissible by the defendant to show knowledge of the servant, there is no sound reason, we think, why the servant should not be permitted to show a custom of ballasting to disprove or negative the idea that he had notice of an unballasted switch. Upon principle we think the same rule should apply with reference to the custom and usage of other railroads, that is that it is admissible to prove or disprove notice to the servant of the condition of the switch yard complained of.

In this case appellee introduced evidence also of the custom and usage of other railroad companies with reference to ballasting similar switch yards, over the objections of appellant. As already seen we have quoted our Supreme Court as approving this very character of evidence for the purpose of proving negligence. Our Supreme Court does not seem to have passed on this very question as a contested point in the cases named, and the decisions of that court are not in entire harmony on this question. However, it has repeatedly held that it is competent for the defendant to show that it is in line with common usage as tending to disprove negligence, though such evidence is not conclusive. It has also held that it is competent for a servant to prove he did his work in the usual and customary way as tending to disprove contributory negligence. There is considerable logic in the claim that the plaintiff ought to be allowed to prove that it was the practice and custom of other railroads generally to ballast switch yards at similar places as tending to show negligence, in connection with the other evidence offered showing that it was dangerous and unsafe. Such evidence should not be held as conclusive, however, in any case. Labatt on Master and Servant lays down the rule in Vol. 1, sec. 43, thus: ''It may be laid down as an undisputed proposition that, where the injury complained of was caused by an instrumentality or method which,

at the time of the accident, was in its normal condition, evidence going to show that such an instrumentality was or was not commonly used under similar circumstances by persons in the same line of business as the defendant is always competent for the purpose of proving that he was or was not in the exercise of due care in adopting or retaining that instrumentality as a part of his plant.''

At any rate the evidence was competent in this case on the question of notice to appellee, and no instruction was given the jury informing them that the plaintiff could recover on failure to, comply with such custom and usage.   On the contrary the jury was instructed that the law does not require railroad companies to ballast their roads in switchyards or elsewhere with cinders or other substances to and on the level with the top of the ties or in any other manner, unless the same is necessary to make their tracks reasonably safe for the purposes and uses for which such tracks are used and intended to be used.

The only instruction given by the appellee, being one on the measure of damages, is complained of as erroneous.   The only objection to the same that is tenable, so far as we can see, is that it does not not limit the damages to those claimed or charged in the declaration.   The declaration however claims or charges all the damages that are proved, and the only damages proved were such as he received on that crossing and none other.   The jury could not have been misled thereby.   What we have already said answers the objections to the refusing of appellant's peremptory instruction.

The court did not err in refusing to have the jury to say upon which count or counts they found for the appellee, if any.   Junction M. Co. v. Ench, 111 Ill. App. 353; Stevenson v. Avery C. & M. Co., 143 Ill. App. 397.

Finding no reversible error in this record, the judgment of the lower court is affirmed.

*Affirmed.*